**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| GENERAL CABLE INDUSTRIES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| ZURN PEX, INC. (f/k/a UNITED STATES | § | Case No. 4:05-CV-428 |
| BRASS CORPORATION); ZURN | § | |
| INDUSTRIES, INC.; JACUZZI BRANDS, | § | |
| INC.; SHELBY PROPERTIES, INC.; | § | |
| MDP MANUFACTURING, LLC; and | § | |
| PTHREEM LLC, d/b/a TENTH STREET | § | |
| INDUSTRIES, LP, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER**
**GRANTING DEFENDANTS' MOTION TO DISMISS**

The following are pending before the court:

1.    Defendants' motion to dismiss and brief in support (docket entry #11);

2.    Plaintiff's response to Defendants' motion to dismiss (docket entry #21);

3.    Defendants' reply in support of their motion to dismiss and brief in support thereof (docket entry #33); and

4.    General Cable Industries, Inc.'s sur-reply in opposition to Defendants' motion to dismiss (docket entry #36).

After careful consideration, the court is of the opinion that the Defendants' motion to dismiss should be granted.

## I.  BACKGROUND

According to the complaint, the Plaintiff owns property located at 900 Avenue F in Plano,

-1-

Texas.  Pl. Compl., p. 2, ¶ 3.  The Plaintiff alleges that its property was contaminated by the release of trichloroethylene ("TCE") from the adjacent property located at 901 Avenue F in Plano, Texas ("the adjacent property").  Pl. Compl., p. 2, ¶ 4.  The adjacent property is located to the north of the Plaintiff's property.  Pl. Compl., p. 8, ¶ 34.  The groundwater flows from north to south.  *Id*. United States Brass Corporation[1] is the former owner of the adjacent property.  Pl. Compl., p. 5, ¶ 20. United States Brass manufactured plumbing supplies, brass fittings, copper tubing and other products on the adjacent property.  *Id*.  The manufacturing processes included machining, tubeforming, brazing, annealing, electroplating, buffing, assembly and packaging.  *Id*.  Apparently, United States Brass used various chemical substances, including such chlorinated solvents as TCE, during its manufacturing processes.  Pl. Compl., p. 5, ¶ 21.

On March 27, 2001, United States Brass sold the adjacent property to Tenth Street.  Pl. Compl., p. 6, ¶ 22.  Tenth Street subsequently advised United States Brass of contamination that Tenth Street discovered on the adjacent property.  *Id*.  In August 2001, United States Brass advised the Texas Commission on Environmental Quality ("TCEQ")[2] about the contamination.  Pl. Compl., p. 6, ¶¶ 23-24.  On August 28, 2001, the TCEQ issued a notice of violation to Tenth Street regarding chlorinated solvent contamination on the adjacent property.  Pl. Compl., p. 6, ¶ 25; Exh. B.

---

[1]United States Brass Corporation began operations in 1974 and was the indirect wholly owned subsidiary of Eljer Manufacturing, Inc.  Pl. Compl., p. 5, ¶ 15.  Eljer Manufacturing, Inc. was subsequently acquired by Zurn Industries, Inc. in January 1997.  *Id*.  United States Brass Corporation is now known as Zurn Pex.  Pl. Compl., p. 5, ¶ 17.  Zurn Industries, Inc. merged with USI Atlantic, Inc. in June 1998.  Pl. Compl., p. 5, ¶ 18.  US Industries, Inc. was formed as the new holding company for USI Atlantic, Inc. and Zurn Industries, Inc.  *Id*.  US Industries, Inc. is currently known as Jacuzzi Brands, Inc. Pl. Compl., p. 5, ¶ 19.  Jacuzzi Brands, Inc. is the parent and controlling corporation of Zurn Pex, Inc.  *Id*. Jacuzzi Brands, Inc., Zurn Industries, Inc., Shelby Properties, Inc. and Zurn Pex, Inc. are a single enterprise.  *Id*.

[2]The TCEQ was formerly known as the Texas Natural Resource Conservation Commission.

On June 12, 2003, United States Brass and Tenth Street submitted a Voluntary Cleanup Program Application pursuant to § 361.604 of the Texas Solid Waste Disposal Act.  Pl. Compl., p. 7, ¶ 28; Exh. E.  However, the TCEQ denied the application because United States Brass failed to qualify as a Voluntary Cleanup Program applicant.  Pl. Compl., p. 7, ¶ 29; Exh. F.  As a result of the denial, United States Brass created Shelby Properties, Inc. for the purpose of serving as a Voluntary Cleanup Program applicant.  Pl. Compl., p. 7, ¶ 30.  Thereafter, on August 12, 2004, Shelby Properties, Inc. and Tenth Street submitted a new Voluntary Cleanup Program Application.  Pl. Compl., p. 7, ¶ 31; Exh. G.

In October 2004, Shelby Properties, Inc., by and through its environmental consultant (AMEC Earth & Environmental, Inc.), requested access to the Plaintiff's property to assess soil and groundwater conditions associated with the release of TCE and other contaminants from the adjacent property.  Pl. Compl., p. 8, ¶ 35.  On December 7, 2004, the Plaintiff and Shelby Properties, Inc. entered into a "Monitoring Well / Access Agreement" whereby the Plaintiff granted Shelby Properties, Inc. access to its property to permit soil and groundwater sampling and analysis.  Pl. Compl., p. 8, ¶ 36; Exh. I.  The relevant portions of the Monitoring Well / Access Agreement are as follows:

> WHEREAS, operations at the Adjacent Property may have caused the presence of groundwater contamination at, under and in the vicinity of the Adjacent Property; and
>
> WHEREAS, [Shelby Properties, Inc.] has entered into a Voluntary Cleanup Agreement with the Texas Commission on Environmental Quality ("TCEQ"), has been assigned Voluntary Cleanup Program ("VCP") Number 1601, and is currently conducting various environmental investigation and remediation activities at and in the vicinity of the Adjacent Property; and
>
> WHEREAS, [Shelby Properties, Inc.] has requested of [the Plaintiff] that it

-3-

be granted a license to access the [Plaintiff's] Property for the sole purpose of constructing and sampling certain groundwater monitoring well[s] (collectively, the "Well" or "Wells") on the [Plaintiff's] Property in relation to the aforementioned environmental activities; and

———————————

1.   <u>Grant of License</u>.  Subject to the conditions and agreements set forth below, [the Plaintiff] hereby grants [Shelby Properties, Inc.] and its contractor(s) (as are disclosed in advance to [the Plaintiff]), and [Shelby Properties, Inc.] accepts from [the Plaintiff], a non-exclusive, revocable license to access the [Plaintiff's] Property for the limited purpose of constructing, sampling, plugging and abandoning, at [Shelby Properties, Inc.'s] sole cost and expense, those groundwater monitoring well(s) in the location(s) designated in the Work Plan included in attachment "A" to the Agreement (the "Work"). . . .

2.   <u>Restrictions</u>. [Shelby Properties, Inc.] agrees to observe and abide by each and all of the following covenants and conditions of this License:

(b)   The Well(s) shall be constructed, operated and maintained in accordance with all applicable federal, state and local rules, regulations, codes, laws, and ordinances, and all orders, directives or requests of all applicable governmental authorities, including without limitation, the City of Plano, the State of Texas, and the TCEQ (collectively "Applicable Laws").

(c)   The Well(s) shall be drilled, constructed, housed, capped, plugged, removed, filled and otherwise dealt with, in each instance, in accordance with written plans for same that have been submitted to and approved by [the Plaintiff] in advance of such Work. . . .

(d)   . . . [Shelby Properties, Inc.] shall handle and dispose of all waste materials at an off-site location and in compliance with all Applicable Laws. [Shelby Properties, Inc.] and not [the Plaintiff] shall be identified as the generator of such wastes on all manifests and other waste disposal documentation.

(e)   [Shelby Properties, Inc.] shall: (i) keep the Well(s) in good order and repair at their sole cost and expense, (ii) keep the [Plaintiff's] Property free of all trash, debris, and rubbish at their sole cost and expense, (iii) remove all such trash on a daily basis, and (iv) bear all risk of loss regarding the Well and any attendant equipment.

(j)   [Shelby Properties, Inc.] shall, at its sole cost and expense, provide [the Plaintiff] with copies of all laboratory data, sampling results, tables and

notices, permits, certificates, correspondence and other written documents or information received or delivered by [Shelby Properties, Inc.] or its contractors relating to the Work on the [Plaintiff's] Property promptly upon their receipt or delivery. [The Plaintiff] shall have the right to observe all activities of [Shelby Properties, Inc.] and its contractors on the [Plaintiff's] Property and to split any samples taken by [Shelby Properties, Inc.] or its contractors on the [Plaintiff's] Property.

3.    <u>Commencement, Term and Restoration</u>. . . . Upon termination, [Shelby Properties, Inc.] shall promptly remove all of its material, equipment and debris from the [Plaintiff's] Property in accordance with all Applicable Laws, restore the [Plaintiff's] Property to the same condition as existed immediately prior to the installation of the Well(s), and repave, reseal, and restripe any affected parking or paved area in accordance with plans or work orders approved by [the Plaintiff].

Pl. Compl., Exh. I.

Pursuant to the Monitoring Well / Access Agreement, AMEC installed two monitoring wells. Pl. Compl., p. 8, ¶ 37.  Samples taken from the wells revealed the presence of TCE and other chlorinated compounds in the groundwater at the Plaintiff's property.  *Id*.  AMEC subsequently installed eight additional monitoring wells and conducted multiple rounds of groundwater sampling on the Plaintiff's property.  Pl. Compl., p. 8, ¶ 38.  This sampling revealed a plume of groundwater contaminated with TCE and its breakdown products which has continued to migrate from the adjacent property to the Plaintiff's property.  *Id*.

Prior to agreeing to the terms of the Monitoring Well / Access Agreement, the Plaintiff had entered into a contract to sell its property.  Pl. Compl., p. 9, ¶ 39.  However, due to the contamination, the buyer of the Plaintiff's property terminated the agreement of sale.  Pl. Compl., p. 9, ¶ 40.

The Plaintiff subsequently initiated the instant lawsuit, asserting claims against the Defendants pursuant to the Comprehensive Environmental Response, Compensation and Liability

Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S..C. §§ 9601-9675 ("CERCLA").   The Plaintiff additionally seeks damages against the Defendants for toxic trespass, private nuisance and negligence.   In response to the Plaintiff's complaint, the Defendants filed a motion to dismiss, arguing that the Plaintiff failed to plead facts sufficient to support a cause of action under CERCLA.

## II.  DISCUSSION

### A.  LEGAL STANDARD

District courts may dismiss a complaint for "failure to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).   A district court should grant a motion to dismiss under Rule 12(b)(6) in two situations.   First, "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief," dismissal is proper.  *Scanlan v. Tex*as *A & M University*, 343 F.3d 533, 536 (5th Cir. 2003).   Second, "if the allegations, accepted as true, do not present a claim upon which relief legally can be obtained," dismissal is also proper.  *Adolph v. Fed. Emergency Mgmt. Agency of the United States*, 854 F.2d 732, 735 (5th Cir. 1988) (citations omitted).

Courts in this circuit have "consistently disfavored dismissal under Rule 12(b)(6)." *Scanlan*, 343 F.3d at 536 (citations omitted).   In deciding whether to grant a motion to dismiss, the district court "must not go outside the pleadings and must accept all well-pleaded facts as true, viewing those facts most favorably to the plaintiff."  *Id.* (citations omitted).   "However, conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."  *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993) (citation omitted).

## B.  ANALYSIS

"Congress enacted CERCLA in response to well-publicized toxic waste problems." *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 667 (5th Cir. 1990) (citations omitted).  CERCLA establishes "'a means of controlling and financing both governmental and private responses to hazardous releases at abandoned and inactive waste disposal sites.'" *Id.*, quoting *Bulk Distribution Centers, Inc. v. Monsanto Co.*, 589 F.Supp. 1437, 1441 (S.D. Fla. 1984); *see New York v. Shore Realty Corp.*, 759 F.2d 1032, 1041-42 (2d Cir. 1985).  "Section 9607(a), one of CERCLA's key provisions for furthering this objective, permits both government and private plaintiffs to recover from responsible parties the costs incurred in cleaning up and responding to hazardous substances at those sites." *Id.*

"To establish a prima facie case of liability in a CERCLA cost recovery action, a plaintiff must prove: (1) that the site in question is a 'facility' as defined in § 9601(9); (2) that the defendant is a responsible person under § 9607(a); (3) that a release or a threatened release of a hazardous substance has occurred; and (4) that the release or threatened release has caused the plaintiff to incur response costs." *Id.* at 668 (citations omitted).  "A plaintiff may recover those response costs that are necessary and consistent with the National Contingency Plan ('NCP')." *Id.*, citing 42 U.S.C. § 9607(a)(4)(B); *see* 40 C.F.R. Part 300 (1988).  "The National Contingency Plan is a detailed set of regulations . . . which describe methods of responding to hazardous waste problems and set forth guidelines for the appropriate roles of state and federal agencies and private parties." *McGregor v. Industrial Excess Landfill, Inc.* 856 F.2d 39, 42 (6th Cir. 1988).

Here, the Defendants argue that the Plaintiff failed to plead a prima facie case for its CERCLA claims because the Plaintiff failed to allege that it incurred response costs.  "The statutory provision suggesting a threshold for liability is the requirement that a release or threatened release

have 'caus[ed] the incurrence of response costs.'" *Amoco Oil Co.*, 889 F.2d at 669, quoting 42 U.S.C. § 9607(a)(4). "Response costs are generally and specifically defined to include a variety of actions designed to protect the public health or the environment."[3] *Id.* "To justifiably incur response costs, one necessarily must have acted to contain a release threatening the public health or the environment." *Id.* at 669-670.

In its complaint, the Plaintiff alleged that it "incurred costs to investigate and monitor the contamination of its Property." Pl. Compl., p. 9, ¶ 43. Additionally, the Plaintiff alleged that it "has expended response costs consistent with the National Contingency Plan ('NCP'), 40 CFR 300, within the meaning of CERCLA § 107(a)(4), 42 U.S.C. § 9607(a)(4), including costs to monitor, assess, and evaluate the release or threat of release of hazardous substances into the environment."

---

[3] "In § 9601(25) 'response' is defined to mean 'remove, removal, remedy, and remedial action....' In turn, these terms are further defined in the statute.

Section 9601(23) defines 'remove' or 'removal' to include

the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

Section 9601(24) defines 'remedy' or 'remedial action' to include, among others, 'those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment.'"

*Amoco Oil Co.*, 889 F.2d at 669 n. 7.

Pl. Compl., p. 11, ¶ 63.

"In addition to a jurisdictional statement and a prayer for relief, Federal Rule of Civil Procedure 8(a) requires that the plaintiff include 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *McGregor*, 856 F.2d at 42. "The purpose of the complaint is to 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Id.*, quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct 99, 2 L.Ed.2d 80 (1957).

The Plaintiff in this action pled with specificity the response actions taken by the Defendants to contain the release of TCE. The Plaintiff, however, failed to allege any similar factual basis for its conclusory allegation that it expended response costs consistent with the National Contingency Plan. *See McGregor*, 856 F.2d at 43; *see also Amoco Oil Co.*, 889 F.2d at 670. The Plaintiff failed to allege what response costs it has incurred in containing the release of TCE. "'[W]hen a complaint omits facts that, if they existed, would clearly dominate the case, it seems fair to assume that those facts do not exist.'" *McGregor*, 856 F.2d at 43, quoting *O'Brien v. DiGrazia*, 544 F.2d 543, 546 n. 3 (1st Cir. 1976).[4] As such, the court concludes that the Plaintiff failed to adequately allege that it incurred response costs consistent with the National Contingency Plan. *See Chaplin v. Exxon Co.*, 1986 WL 13130, *4 (S.D. Tex. 1986). Although the Plaintiff may have suffered damage to its property, such damages are apparently not recoverable under CERCLA unless and until the Plaintiff itself has incurred response costs. *Id.* at *2.[5]

---

[4]The court notes that the Plaintiff filed its First Amended Complaint on August 10, 2006. The amended pleading, however, does not address the issues presented in the Defendants' motion to dismiss.

[5]The Plaintiff also seeks the recovery of its "costs of litigation, including but not limited to recoverable attorneys' fees, expert fees, and engineering fees." Pl. Compl., pp. 12-13, ¶¶ 69 & 77. Although such fees may be recoverable under CERCLA, the fees must be closely tied to the actual cleanup. *See In re Combustion, Inc.*, 968 F.Supp. 1112, 1114-15 (W.D. La. 1996). Since the Plaintiff

## III.  CONCLUSION

Based on the foregoing, the court hereby **ORDERS** that the Defendants' motion to dismiss (docket entry #11) is **GRANTED**.  The Plaintiff's CERCLA claims against all of the Defendants are **DISMISSED WITHOUT PREJUDICE**.[6]

This court declines to exercise supplemental jurisdiction over the remaining state law claims now that the federal claims have been dismissed.  28 U.S.C. § 1367(c)(3).  It is therefore ordered that the remaining state law claims are hereby **DISMISSED WITHOUT PREJUDICE** to the refiling of the same in the appropriate state court.  *See Robertson v. Neuromedical Center*, 161 F.3d 292, 296 (5th Cir. 1998) (". . . if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well); *Reese v. Anderson*, 926 F.2d 494, 501 n. 9 (5th Cir. 1991) ("[s]uch dismissal is perhaps the practice in this circuit . . .).

**SIGNED this the 28th day of September, 2006.**

_Richard A. Schell_
RICHARD A. SCHELL
UNITED STATES DISTRICT JUDGE

---

failed to allege that it was involved in the actual clean up, the expenditure of fees for attorneys, experts and engineers could not be said to be closely tied to the actual cleanup.  Accordingly, such fees, in this action, cannot serve as recoverable costs under CERCLA.

[6]In the event the court denied the Defendants' motion to dismiss, the Defendants moved the court to dismiss Defendant Jacuzzi Brands, Inc. for lack of personal jurisdiction.  In light of the court's ruling, it is unnecessary for the court to address this issue.